FILED

2013 May-10  PM 03:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **SAMMIE L. WILLIAMS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:11-CV-2138-VEH** |
| | ) |
| **JOHNNY KYNARD LOGGING,** | ) |
| **INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION AND ORDER

THIS CAUSE is before the court on Defendants' Motion for Summary Judgment (the "Motion") (Doc. 30) filed on October 26, 2012.  Plaintiff responded on November 13, 2012.  (Doc. 36.)  Defendants replied on December 3, 2012.  (Doc. 39.)  The Motion is now ripe for disposition.

## I.     BACKGROUND[1]

Defendants Johnny Kynard Logging, Inc. ("JKL") and Double K Logging, LLC

---

[1] When deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor.  *See Optimun Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F. 3d 1231, 1241 (11th Cir. 2007).  Thus, this memorandum opinion states all disputed facts in the light most favorable to the Plaintiff.

("Double K") are logging companies based in Hale County Alabama.[2]   Both companies use the same types of equipment—a cutter, a skidder, and a loader.  Both companies use contract haulers[3] to transport their logs to a mill for processing.  And, both companies serve many of the same mills. While the companies employ separate bookkeepers, JKL's bookkeeper Michelle Montz does some work for Double K two days a week.  This work takes about ten minutes of her time.  (Doc. 32-8 at 17.)

JKL and Double K do differ in some respects.  For example, JKL is a clear cutting operation.  It cuts and hauls primarily "saw timber"—i.e., trees which will be made into lumber.  (Doc. 32-1 at 8–9.)   At all relevant times, JKL employed more than eight (8) people.  Conversely, Double K is a thinning operation.  It cuts and hauls primarily "pulpwood"—i.e., trees which will not be made into lumber. (*Id.*) The equipment Double K uses differs slights from the equipment JKL uses. (Doc. 32-

─────────────────────

[2] Defendant Johnny W. Kynard, III (Kynard") is the sole owner of JKL and a 50% owner of Double K.  The sole basis for Williams's claim against Kynard is that he is the alter ego of Double K and JKL. (Doc. 1 at 3, ¶ 7) ("Defendant John W. Kynard, III ("Kynard") is a resident of Hale County, Alabama, [and] is the alter ego of Kynard Logging [and] Double K . . . .")

[3] The term contract hauler, while familiar to the parties, requires some explanation.  Both Double K and JKL own logging trucks and directly employ truck drivers.  However, Double K and JKL do not always have wood for their trucks to transport.  As a result, the truck drivers can experience significant downtime.  To combat this problem, both Double K and JKL loan their trucks to other companies on a contract basis.  (Doc. 31 at 6, ¶ 7; Doc. 36 at 8, ¶ 18; Doc. 32-7 at 18.)  A third party sets the contract rate, and Double K and JKL are paid for each load their trucks deliver.  (Doc. 32-7 at 4.)  Because of this arrangement, Double K's truck drivers often haul wood for JKL and vice versa.  (Doc. 31 at 6, ¶ 7; Doc. 36 at 8, ¶ 18.)  However, these drivers also haul wood for other companies.

7 at 25.)  For example, the cutter has a different head, the skidder is smaller, and the loader has a different delimber on the end.  (*Id.*)  Double K contends that it has never employed more than eight (8) people.

JKL began operating around 1996, and is owned entirely by Defendant Johnny Kynard ("Kynard").  Double K was formed in 2006, and owned equally by Kynard and his long time friend Scott Kimbrel ("Kimbrel").  Kynard and Kimbrel have known each other their entire lives.  (Doc. 32-7 at 2.)  Prior to forming Double K, Kynard and Kimbrel partnered on a catfish farm.  (Doc. 32-7 at 2.)  After forming Double K, Kynard and Kimbrel formed a wood chipping business called KimKy Chipping.  (Doc. 32-1 at 37.)  As with Double K, Kynard and Kimbrel are fifty-fifty partners in the catfish farm and Kimky Chipping.  (*Id.*)  Prior to forming Double K, Kimbrel had little, if any, experience with the logging industry.  (Doc. 32-5 at 30.)

In managing Double K, both Kynard and Kimbrel have authority to make day-to-day business decisions.  (Doc. 32-1 at 43, 45.)  For example, both men can hire and fire employees, direct employee's activities, and make market decisions for Double K.  (Doc. 32-1 at 6, 38, 43, 45.)  Kimbrel and Kynard always back each other up on these decisions.  (Doc. 32-6 at 12.)  Regarding major business decisions, Kimbrel and Kynard always come to an agreement.  (Doc. 32-6 at 12; Doc. 32-7 at 20.)

Double K does not have enough employees to qualify for a group health

3

insurance plan.  (Doc. 36 at 9–10, ¶ 21.)  Nonetheless, Double K provides health insurance to its employees through JKL.  JKL represents to its insurer that Double K's employees are actually employed by JKL.  JKL pays the premiums for Double K's employees, and Double K reimburses JKL for these expenses.  (Doc. 36 at 9–10, ¶ 21.)

Plaintiff Sammie Williams ("Williams") is a truck driver.  From 2003 to June 2008, Williams drove a log truck for JKL.  JKL paid him a weekly salary regardless of how many hours he worked.

In June 2008, JKL sold three logging trucks, including the one driven by Williams, to Double K.  (Doc. 36 at 5, ¶ 6.)  In July 2008, Kynard told Williams "I'm going to put you on Double K, you know."  (Doc. 32-5 at 17–18.)  Williams then began driving for Double K.  No one told Williams that he had been terminated from JKL or that he had been hired by Double K.  (*Id.*)  Williams was not given a choice in the matter.  (*Id.*)  Double K, like JKL, paid Williams a weekly salary regardless of how many hours he worked.  Williams drove for Double K until April 2010.

Williams now contends that Double K violated the overtime wage requirement of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219.  He seeks unpaid overtime wages and liquidated damages.  Defendants counter that Williams's claim fails as a matter of law for numerous reasons.  After reviewing the record and the

4

parties' briefs, the court concludes that summary judgment is inappropriate on all but one of the grounds raised by Defendants.

## II.   LEGAL STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(a).  "All reasonable doubts about the facts" and "all justifiable inferences" are resolved in favor of the nonmoving party.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).[4]  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  The substantive law will identify which facts are material and which are irrelevant.  *Id.*

The summary judgment analysis varies somewhat depending on which party bears the burden of proof at trial.  *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)).

---

[4]  Rule 56 was amended in 2010. The Advisory Committee was careful to note, however, that "[t]he standard for granting summary judgment remains unchanged."  Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments.  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

If the moving party would bear the burden of proof on an issue, then it may meet its burden on summary judgment only by presenting positive evidence demonstrating an absence of a genuine issue of material fact—i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Id.* at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial. *Id.*

If the nonmoving party would bear the burden of proof on an issue at trial, then the moving party can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115–16. First, the moving party may produce affirmative evidence negating a material fact, thereby demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 1116. If the moving party produces such evidence, then the nonmoving party must respond with positive evidence sufficient to defeat a motion for a directed verdict at trial. *Id.*

Second, the moving party may affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on a material element. *Id.* The moving party is not required to produce evidence negating its opponent's claim, but it must direct the court to the hole in the nonmoving party's case. *Id.* at 1115–16. If the moving party satisfies this burden, the nonmoving party may either point to evidence in the record which would sustain a judgment at trial, or may come forward

6

with additional evidence which would also sustain a judgment. *Id.* at 1116–17.  The nonmoving party cannot simply rest on mere allegations; he must set forth evidence of specific facts.  *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183 (1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136–37 (1992)).

## III.   ANALYSIS

There is no dispute that the FLSA applies here.  Under the FLSA, employers must pay overtime wages to employees who are "employed" more than forty hours per week.  29 U.S.C. § 207(a)(1); *see also Dade Cnty. v. Alvarez*, 124 F.3d 1380, 1384 (11th Cir. 1997).  The term "employ" means "to suffer or permit to work."  29 U.S.C. § 203(g); *see also Reich v. Dep't. of Conservation & Natural Res., State of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994).  If an employee works more than forty hours in a week, his employer must compensate him at one and a half times his regular rate of pay.  *See* 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.108; *see also Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945)

Defendants' Motion raises four reasons the FLSA's overtime wage requirement does not apply to them. First, Defendant JKL contends that Williams's claim against it is barred by the statute of limitations.   Second, Defendant Double K contends that it is exempt from the FLSA's overtime wage requirement under 29 U.S.C. §

213(b)(28) (hereinafter the "forestry exemption").   Third, the Motion asserts that Defendants Double K and JKL are not a single enterprise under the FLSA.  Fourth, the Motion asserts that Kynard is not the alter ego of Double K or JKL.  The court will address each in turn.

### A.    Statute of Limitations

The statute of limitations under the FLSA is usually two years.  *See* 29 U.S.C. § 255(a).  However, the statute extends to three years when a defendant commits a willful violation.  *See id.*  An employer willfully violates the FLSA when it either (1) knows its conduct violates the FLSA, or (2) recklessly disregards "the matter of whether its conduct [is] prohibited by the FLSA."  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 129, 108 S. Ct. 1677,  1680 (1988) (citing *Brock v. Richland Shoe Co.*, 799 F.2d 80 (5th Cir. 1986)).  Thus, the three year statute of limitations can apply even when an employer does not know it is violating the statute.  *Allen v. Bd. of Educ. for Bibb Cnty.*, 495 F.3d 1306, 1324 (11th Cir. 2007).  If an employer acts recklessly in determining its legal obligation, then it commits a willful violation of the FLSA. *Id.*

The burden is on the employee to show his employer committed a willful violation by a preponderance of the evidence.  *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1162–63 (11th Cir. 2008).  Additionally, the

8

question of willfulness is a mixed question of law and fact.  *See Allen*, 495 F.3d at 1324.  When this question involves issues of fact, it is inappropriate for summary disposition.  *See Alvarez Perez*, 515 F.3d at 1163; *Pabst v. Okla. Gas & Elec. Co.*, 228 F.3d 1128, 1137 (10th Cir. 2000); *Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 162 (4th Cir. 1992); *Morrison v. Quality Trans. Servs., Inc.*, 474 F.Supp. 2d 1303, 1313 (S.D. Fla. 2007).

Williams last worked for JKL in June 2008.  (Doc. 31 at 5, ¶ 4.)  He filed this lawsuit on June 18, 2011, almost three years later.  Thus, if the two year statute of limitations applies, Williams's claim against JKL is time barred.  Conversely, if the three year statute of limitations applies, it is undisputed that JKL owes Williams at least two weeks of overtime pay.  (Doc. 32-6 at 7.)

Williams contends that Defendants knowingly violated the FLSA.  Specifically, he contends that JKL and Kynard learned of their obligations under the FLSA in May or early June 2008.  (Doc. 36 at 5, ¶ 2; at 18.)  At that time, another employee of JKL sued JKL for unpaid overtime wages.  *See* Answer, Wade v. Johnny Kynard Logging, Inc., et al., No. 2:08-CV-783-AKK (N.D. Ala. May 28, 2008), ECF No. 3.  Williams contends that this lawsuit prompted Kynard to sell Williams's truck to Double K and send him to drive for that company.  (Doc. 36 at 5, ¶ 6; Doc. 32-5 at 17–18.)  This version of events does not support finding a willful violation of the FLSA.  The FLSA

simply requires employers to pay certain employees overtime. It does not prohibit transferring an employee from a covered entity to a non-covered entity to avoid paying that employee overtime.  Therefore, the act of transferring Williams to Double K did not violate the FLSA.

However, if Double K was required to pay Williams overtime wages but did not, that act would violate the FLSA.  In addition to the above argument, Williams contends that JKL and Double K are a single enterprise for purposes of the FLSA. *See* Part III.C. *infra*.  If JKL and Double K are a single enterprise, then Defendants were required to pay Williams overtime wages during his employment with Double K.  As explained in Part III.C *infra*, there is a material issue of fact regarding whether JKL and Double K are a single enterprise.  Assuming a jury were to find that JKL and Double K are a single enterprise, a jury could also find that these Defendants knew JKL and Double K were a single enterprise, and, therefore, knew they were required to pay Williams overtime wages.  Because a reasonable jury could find facts which establish a willful violation of the FLSA, summary judgment on this issue is inappropriate.

And, even if a reasonable jury could not find that the Defendants knowingly violated the FLSA, it could certainly find that Defendants recklessly disregarded the possibility that JKL and Double K are a single enterprise (and therefore required to

pay overtime wages under the FLSA).  Because a reasonable jury could make this finding, summary judgment is also inappropriate for this alternative reason.

A material issue of fact remains regarding whether Defendants JKL and Double K willfully violated the FLSA.  Therefore, these Defendants have not shown that Williams's claim against JKL is time barred as a matter of law.  The Motion, as it relates to this issue, is due to be **DENIED WITHOUT PREJUDICE**.  After the jury resolves the factual disputes related to these Defendants' willfulness, JKL may reassert its statute of limitations defense in accord with the jury's findings.

## B.    Double K's Entitlement to the Forestry Exemption

The FLSA, like most rules, contains exceptions and exemptions. *See* U.S.C. § 213. Relevant here, the forestry exemption provides that the FLSA's general rule on overtime wages:

> shall not apply with respect to . . . any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed eight.

29 U.S.C. § 213(b)(28) (emphasis added).

Double K asserts that it can claim the forestry exemption because it never employed more than eight (8) people.  *See* 29 U.S.C. § 213(b)(28).   Exemptions

11

from the FLSA are narrowly construed against the employer.  *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995)  An employer must prove its entitlement to an exemption by clear and convincing evidence.  *See Gregory v. First Title of Am., Inc.*, 555 F.3d 1300, 1302 (11th Cir. 2009) (citation omitted).

It is undisputed that Double K's payroll records reflect that it never employed more than eight (8) people.  (Doc. 36 at 3, ¶ 6.)  Rather than argue that Double K actually employed more than eight (8) people, Williams contends that Double K and JKL are a single enterprise under the FLSA.  Still, when considered in conjunction with Williams's evidence that Kynard transferred him to Double K for the express purpose of avoiding the overtime requirements of the FLSA, *see* Part III.A *supra*, and consistent with the court's findings regarding Williams's single enterprise argument, *see* Part III.C *infra*, the court concludes that Double K's payroll records do not establish its entitlement to the forestry exemption by clear and convincing evidence.  Therefore, Defendants' Motion on this issue is due to be **DENIED**.

### C.    Single Enterprise Theory

The FLSA's overtime wage requirement applies to employers whose employees are "employed in an enterprise engaged in commerce or in the production of goods

for commerce." 29 U.S.C. § 207(a)(1) (emphasis added). The FLSA defines an

"enterprise" as:

> related activities performed (either through unified operation or common
> control) by any person or persons for a common business purpose, and
> includes all such activities whether performed in one or more
> establishments or by one or more corporate or other organizational units.

29 U.S.C. § 203(r)(1). Thus, seemingly distinct businesses can constitute a single

enterprise under the FLSA. *See Brennan v. Veterans Cleaning Serv., Inc.*, 482 F.2d

1362, 1366 (5th Cir. 1973).[5] Here, the parties' hotly dispute whether JKL and

Double K are a single enterprise. If they are, then Williams may count the employees

of JKL in computing whether Double K can claim the forestry exemption. And, it is

not seriously disputed that, if Williams can count the employees of JKL, Double K

cannot claim the forestry exemption.

A single enterprise exists when the following three elements are present: (1)

related activities, (2) unified operation or common control, and (3) a common

business purpose. *See Donovan v. Easton Land & Dev. Inc.*, 723 F.2d 1549, 1551

(11th Cir. 1984). The question of whether several businesses constitute an

"enterprise" is a question of law for the court. *See Dunlop v. Ashy*, 555 F.2d 1228,

1229 (5th Cir. 1977). The question is "to be resolved in each case on the basis of all

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the particular facts . . . ." *Dunlop*, 555 F.2d at 1230 (citing *Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 846 (8th Cir. 1975)).  This court must liberally construe the definition of "enterprise."  *See Dunlop*, 555 F.2d at 1234; *Shultz v. Mack Farland & Sons Roofing Co.*, 413 F.2d 1296, 1300 (5th Cir. 1969).

From the undisputed facts, the court concludes that Double K and JKL engage in "related activities" and share a "common business purpose."  Thus, two elements of a single enterprise are present.  Regarding the third element, the court finds that a genuine issue of fact remains regarding Kynard's power to control Double K.  If the jury finds that Kynard controls Double K, then the third element of a single enterprise is also present.  Because a jury must determine the issue of Kynard's control over Double K, summary judgment is inappropriate.

### 1. Related Activities

The "related activities" prong asks if two or more businesses are "the same or similar" or if they are "auxiliary and service activities" for one another.  *See id.* (citing S.Rep. No. 87-145 (1961), *reprinted in* 1961 U.S.C.C.A.N. 1620, 1660); *see also Brennan v. Veterans Cleaning Serv., Inc.*, 482 F.2d 1362, 1366 (5th Cir. 1973); *Wirtz v. Savannah Bank & Trust Co. of Savannah*, 362 F.2d 857, 860 (5th Cir. 1966).  These inquiries are distinct.  Two businesses are the "same or similar" when they operate like "the individual retail or service stores in a chain."  *See Brennan*, 482 F.2d

14

at 1366.  Alternatively, two business are "auxiliary and service activities" when they involve "operational interdependence in fact."  *See Donovan*, 723 F.2d at 1551.

The court concludes that Double K and JKL engage in related activities.  Both companies cut trees.  (Doc. 36 at 7–8, ¶ 13.)  Both companies use the same type of equipment—a cutter, a skidder, and a loader.  (Doc. 36 at 8, ¶ 14; Doc. 32-7 at 25.)  Both companies use contract haulers to transport their wood.  (Doc. 36 at 8–9, ¶ 17–18.)  And, both companies often serve the same mills.  (Doc. 36 to 7–8, ¶ 13.)

Defendants contend that Double K and JKL are not the "same or similar" because Double K is a thinning operation and JKL is a clear cutting operation.  Kimbrel testified that there are variations between the equipment used by the two operations.   (Doc. 32-7 at 25.)  And, Kynard testified that the kind and size of the trees differ between a thinning operation and a clear cut operation.  (Doc. 32-1 at 8–9.) The court declines to draw such a fine distinction.  Both Double K and JKL use cutters, skidders, and  loaders.  And, a tree, whether hardwood or pine, whether saw timber or pulpwood, is simply a resource—a raw material—that must be harvested and  transported  to  a  mill  for  processing.   Both Double K and JKL provide the essential service of harvesting and transporting raw materials for the timber industry.  The  work  done  by  the  employees  of  both  companies  appears,  for  all  relevant purposes, to be exactly the same.  At the very least, the work of Double K and JKL

15

is similar enough that it is "related" for purposes of the FLSA.

Defendants rely on *Donovan v. Easton Land & Development, Inc.*, where the Eleventh Circuit held that the activities of two businesses—a lounge and a hotel—were not related. 723 F.2d at 1551–52. Defendants' reliance on *Donovan* is misplaced. In *Donovan*, the two businesses provided two different types of services—the hotel provided lodging while the lounge provided food and drinks. *Id.* at 1552. Additionally, the hotel served one clientele and the lounge served primarily a different clientele. *Id.* Thus, the court found that the two businesses were not operationally interdependent (and thus not related under the "auxiliary and service activities" inquiry). *Id.* Additionally, the court found that the lounge and hotel were not engaged in the "same or similar" activities because they were not providing "food and shelter to the same customers." *Id. Donovan* is distinguishable from this case because both Double K and JKL provide the same service—i.e., harvesting and hauling trees—to many of the same customers.

This case is more akin to *Shultz v. Mack Farland & Sons Roofing Co.*, 413 F.2d 1296 (5th Cir. 1969). In *Shultz*, two separate roofing companies operated in different parts of Florida. *Id.* The companies employed separate supervisors and crewmen. Still, the former Fifth Circuit concluded, without much discussion, that the companies were related. *See id.* at 1299–1301. Like the separate roofing companies in *Shultz*,

Double K and JKL are separate logging companies with separate work crews.  And, Double K and JKL are arguably more related than the roofing companies at issue in *Shultz* because Double K and JKL serve mostly the same mills in the same area of Alabama, while the roofing companies served different geographic regions.  *Shultz* is different from this case in one respect: the work crews in *Shultz* sometimes exchanged employees.  However, this difference is immaterial to the "related activities" inquiry.  Instead, this fact is more relevant to the common control inquiry.  Because both Double K and JKL cut and haul trees to many of the same mills, their activities are "related" for purposes of the FLSA.

> 2.     Common Business Purpose

The "common business purpose" prong asks if two or more businesses share a common objective or are operated as a single business entity.  *See* 29 C.F.R. § 779.213.  The term "common business purpose" is not "a narrow concept," 29 C.F.R. § 779.212, and the existence of a common business purpose will "ordinarily . . . be readily apparent from the facts." 29 C.F.R. § 779.213.  "The facts may show that the activities are related to a single business objective . . . .  In such cases, it will follow that they are performed for a common business purpose." *Id.*  It is clear, however, that "[m]ore than a common goal to make a profit" is required to find a common business purpose. *See Donovan*, 723 F.2d at 1553.  "Many of the

considerations relevant in determining the existence of related activities are pertinent to determine the existence of a 'common business purpose.'" *Id.*

The court concludes that Double K and JKL share a common business purpose—i.e., harvesting timber for profit. Both operations cut and haul logs which are often taken to the same mills. (Doc. 36 at 7–8, ¶ 13.) Both companies employ contract haulers to move the logs. And, both companies use the same types of equipment. Once again, Defendants contend that Double K is a thinning operation and that JKL is a clear cut operation. This contention actually supports finding a common business purpose. While thinning and clear cutting differ, they are both an integral part of the forestry industry. And, by operating both a thinning operation and a clear cutting operation, Double K and JKL can participate in both areas of this industry.

Defendants point out that Double K and JKL keep separate books, separate bank accounts, and do not intermingle profits. While these facts weigh against finding a common business purpose, they are not determinative. Instead, the term "common business purpose" clearly "encompasses activities . . . which are directed to the same business objective or to similar objectives in which the [Defendants] have an interest." 29 C.F.R. § 779.213. Here, Double K and JKL have the same objective: cutting and hauling as many trees as possible. The more trees the two companies cut

and deliver, the more money they can make.  While the size and type of the tree may differ between the two companies, the work is the same or very similar.

Additionally, Kynard wholly owns JKL, and has a fifty percent (50%) ownership stake in Double K.  By operating both companies, Kynard can participate in both the thinning and clear cutting segments of the timber industry.  Thus, Kynard can increase his market exposure in the industry and, thereby, his profits. Furthermore, the profits of Double K and JKL are intermingled in the sense that they both will go into Kynard's pocket.[6]   Finally, if the jury finds that Kynard controls Double K (discussed in Part III.C.3 *infra*), this control would further support finding a common business purpose.  *See Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 848 (8th Cir. 1975).

### 3.    Common Control or Unified Operations

The "common control or unified operations" prong asks whether two or more businesses are either (1) under common control or (2) operated as a unified operation. Common control means that a single entity has "the power to control the related business operations."  *Donovan*, 723 F.2d at 1552.  The Secretary of Labor, by regulation, has further defined this term:

The word "control" may be defined as the act or fact of controlling;

---

[6]  Of course, Kynard's share of Double K's profits is limited to fifty percent (50%).

power or authority to control; directing or restraining domination. "Control" thus includes the power or authority to control. In relation to the performance of the described activities, the "control," referred to in the definition in section 3(r) includes the power to direct, restrict, regulate, govern, or administer the performance of the activities. "Common" control includes the sharing of control and it is not limited to sole control or complete control by one person or corporation. "Common" control therefore exists where the performance of the described activities are controlled by one person or by a number of persons, corporations, or other organizational units acting together. This is clearly supported by the definition which specifically includes in the "enterprise" all such activities whether performed by "one or more corporate or other organizational units."

29 C.F.R. § 779.221 (1970); *see also* 35 Fed. Reg. 5856, 5868–69 (April 9, 1970).

A controlling ownership interest is not required to find common control. *Donovan*, 723 F.2d at 1552.

Unified operation, on the other hand, means operating several business "so that they are in effect a single business unit or an organized business system which is an economic unit directed to the accomplishment of a common business purpose." *Dunlop*, 555 F.2d at 1232; *see* 29 C.F.R. § 779.220. Mutual cooperation among several business is not enough. *See id.*; *Donovan*, 723 F.2d at 1552. Businesses which keep separate books, do not intermingle funds, obtain separate insurance, order supplies separately, do not interchange employees, and keep separate managers are probably not a unified operation. *See Donovan*, 723 F.2d at 1552. Instead, a unified operation will look or act like a single business entity. *See* 29 C.F.R. § 779.220. For

20

example, separate businesses may operate under a single trade name, construct identical establishments, use identical equipment, sell the same goods or provide the same services, and otherwise standardize their activities. *Id.*

Turning first to common control, it is undisputed that Kynard controls JKL. In fact, as the sole owner of JKL, the law recognizes that Kynard can control JKL whether or not he actually exercises this power. *See Donovan*, 723 F.2d at 1552. However, the parties dispute whether Kynard "controlled" Double K for purposes of the FLSA.

It is also undisputed that Kynard owns a fifty percent (50%) interest in Double K. Because Kynard lacks a majority ownership interest, the court must examine whether Kynard exercised control of Double K in fact. Kynard testified that both he and Kimbrel have authority to make day-to-day business decisions for Double K. (Doc. 32-6 at 12.) For example, both Kynard and Kimbrel could hire or fire Double K's employees and otherwise direct their activities. (Doc. 32-1 at 6, 38, 43, 48.) Kynard further testified that he and Kimbrel back each other up on these decisions. (Doc. 32-6 at 12.) Finally, Kynard testified that he and Kimbrel always agree on all major business decisions. (*Id.*) Kimbrel verified this arrangement. (Doc. 32-7 at 20.)

From this undisputed testimony, the court concludes that Kynard can, and does, manage the day-to-day affairs of Double K. Additionally, the court concludes that

Kynard and Kimbrel defer to each others' day-to-day management decisions.  In other words, if Kynard makes a decision, Kimbrel goes along with it, and vice versa.  In effect, then, Kynard's day-to-day decisions are binding on Double K.

The court further concludes that there is at least a material issue of fact regarding Kynard's power to make major business decisions for Double K.  While Kynard lacked a controlling ownership interest, the regulations only require that he exercise control over Double K in fact.  *See* 29 C.F.R. § 779.221.  Here, a reasonable jury could infer that Kynard had the final say at Double K.

First, the case law recognizes that a family group can have control even though no member of the family group owns a controlling ownership interest.  *See Reich v. Bay, Inc.*, 23 F.3d 110, 115 (5th Cir. 1994); *Donovan v. Sideris*, 688 F.2d 74 (8th Cir. 1982).  The law assumes that family members will work together for the benefit of the family.  Thus, the law aggregates the ownership interests of family members for the purpose of testing common control unless the facts clearly show otherwise.  *See id.*; *see also Brennan v. Plaza Shoe Store, Inc.*, 522 F.2d 843, 848–850 (8th Cir. 1975).  While Kynard and Kimbrel are not family, they have known each other their entire lives.  (Doc. 32-7 at 2.)  They have also jointly owned and operated several other businesses.  It is undisputed that they back each other up on all day-to-day business decisions and "agree" on all major business decisions.  From these facts, a

22

reasonable jury could infer that Kynard and Kimbrel work together like family members in controlling Double K.  In other words, Kynard can count on Kimbrel to back him up on major business decisions, or Kynard can influence Kimbrel's vote such that Kynard is actually the one calling the shots at Double K.  The regulations are clear that a number of persons "acting together" can exercise common control over an enterprise.  *See* 29 C.F.R. § 779.221.  Given the state of the record, a jury must determine to what extent Kynard and Kimbrel were "acting together" in managing Double K.

Furthermore, other facts suggest that Kynard holds significant leverage in his relationship with Kimbrel.  For example, Kynard has owned his own logging company since 1996.  Conversely, Kimbrel had little experience in the logging business before starting Double K.  (Doc. 32-5 at 6.)  Thus, a reasonable jury could infer that Kimbrel would naturally defer to Kynard's management of Double K.  More important, Kynard provided health insurance to Double K's employees through JKL.  (Doc. 36 at 9–10, ¶ 21.)  In fact, Kynard represented to JKL's insurance provider that Double K's employees were actually employed by JKL.  (*Id.*)  Because Kynard used his wholly-owned company to provide health insurance to Double K's employees, a reasonable jury could infer that Kynard in fact controlled Double K.

Because Kynard and Kimbrel were close friends, and because Kynard had

23

substantial leverage in their business relationship, a reasonable jury could conclude that Kynard called the shots at Double K.  Put simply, even though Kynard owned only fifty percent (50%) of Double K, he acted as if he owned fifty-one percent (51%) or more.  If a jury were to reach this conclusion, then Kynard has "the power to direct, restrict, regulate, govern, or administer the performance of the activities" of Double K, and "controls" Double K for purposes of the FLSA.  29 C.F.R. § 779.221.

Defendants argue that Kynard cannot control Double K because he lacks a controlling ownership interest.  To support this contention, Defendants cite *Fazzie v. RAMM of Central Fla.*, 2008 WL 203419 (M.D. Fla. Jan. 23, 2008).  *Fazzie* is not controlling.  Further, it is distinguishable from this case.  In *Fazzie*, two separately incorporated entities—a drywall and metal framing business and a trucking business—operated out of the same office space.  A single person owned the framing business and was a fifty percent (50%) owner and president of the trucking company. *See id.* at *2.  The *Fazzie* court held that the plaintiff had not established the existence of a common control center for both companies.  Yet, it appears the plaintiff in *Fazzie* relied entirely on the single defendant's common ownership interest in the two companies.  The *Fazzie* court's opinion mentions no other facts which would show that the person with the common ownership interest "controlled" the trucking company.  Thus, *Fazzie* does not say that an ownership interest of fifty percent (50%)

or less establishes the absence of control.  Instead, *Fazzie* merely held that a fifty percent (50%) ownership interest—alone—will not establish control.

As the *Fazzie* court recognized, the standard here is whether "there is a common control center with the ultimate power to make binding policy decisions for all units of the enterprise."  *See id.* at *5 (citing *Dunlop*, 555 F.2d at 1231).  To answer this question, the court must consider *"all* the particular facts" of each individual case.  *Dunlop*, 555 F.2d at 1230 (citation omitted).  On the facts presented here, a reasonable jury could conclude that Kynard controls Double K in fact.

Turning to the unified operations issue, Double K and JKL initially appear operationally independent of one another.  The companies keep separate books and bank accounts, do not intermingle funds, and rarely go to the same property to cut timber.

Williams contends, however, that Double K and JKL are a unified operation because each company uses the other's employees and trucks to move wood to the mills, JKL covers Double K's employees through its group health insurance plan, JKL provides goods and services to Double K on an accounts payable basis, and JKL lends its office employee, Michelle Montz, to Double K for two days a week without reimbursement.  The court is skeptical that these facts can demonstrate operational interdependence.  First, Double K's and JKL's use of contract haulers appears

25

common among logging companies.  Second, even though JKL represents to its health insurer that Double K's employees are employed by JKL, this fact shows no operational interdependence.  Third, Williams provides no reason that lending goods and services on an accounts payable basis demonstrates operational interdependence. Fourth, the work that Michelle Montz did for Double K only took about ten (10) minutes a day.  (Doc. 32-8 at 17.)

Nonetheless, issues of fact remain regarding the relationship between Double K and JKL; specifically, Kynard's ability to direct the equipment and resources of Double K and the way he directed the resources of both companies.  If the jury finds that Kynard can control Double K, the jury could also find facts demonstrating that Kynard operated the two companies interdependently.  Because the issue of unified operation must be determined from the particular facts of each case, *Dunlop*, 555 F.2d at 1230, the court will submit the above factual disputes to the jury.  Once the jury makes factual findings on Kynard's control and operation of Double K, the court will be in a better position to rule on the operational interdependence of Double K and JKL.

Viewing the facts in the light most favorable to Williams, the court concludes that Double K and JKL engage in related activities performed under common control or as a unified operation for a common business purpose.  Therefore, the two

companies are, on this version of the facts, a single enterprise under the FLSA.  For that reason, Defendants' Motion on this issue is due to be **DENIED**.

### D.    Alter Ego

Finally, Defendants contend that Kynard is not the alter ego of Double K or JKL.  (Doc. 31 at 22.)  Under an alter ego theory, a court may pierce the corporate veil and impose personal liability on an individual defendant.  *McKissick v. Auto-Owners Ins. Co.*, 429 So. 2d 1030, 1033 (Ala. 1983) (citation omitted).  In Alabama, a plaintiff can show that an individual defendant is the alter ego of a corporate entity by proving that the individual created the corporate entity "to promote injustice and protect the owner from payment of just obligations."  *Id.* (quoting *Tri-State Building Corp. v. Moore-Handley, Inc.*, 333 So.2d 840, 841 (Ala.Civ.App.1976)).

In his Response (Doc. 36), Williams asserts that the alter ego analysis is subsumed in the common control analysis under the FLSA.  (Doc. 36 at 17.) However, as outlined above, the standard for common control under the FLSA differs sharply from the standard for alter ego liability.  Most significantly, the alter ego standard requires a plaintiff  to show that the defendant created the corporate entity to promote injustice.  *See McKissick*, 429 So. 2d at 1033.

In his Response, Williams admits that "there is no evidence that Double K was

27

formed for the purpose of evading the FLSA overtime requirements . . . ." (Doc. 36 at 17) (emphasis added).  Williams nonetheless contends that, after Double K was formed, Kynard used Double K to avoid paying Williams overtime wages.  (*Id.*) Even assuming that Williams's allegation is true, it would not support piercing the corporate veil here.

Additionally, because Plaintiff offers no argument why Kynard is the alter ego of JKL, he has waived this issue.  In any event, Plaintiff has no evidence to support a finding that Kynard is the alter ego of JKL.

Therefore, Defendants' Motion is due to be **GRANTED** on Williams's alter ego claim.

## IV.  CONCLUSION

For the foregoing reasons, the Defendants' Motion (Doc. 30) is **DENIED IN PART** and **GRANTED IN PART** as follows:

A.   Regarding Defendants' statute of limitations defense, Defendants' Motion is **DENIED**:

B.   Regarding Double K's entitlement to the forestry exemption, Defendants' Motion is **DENIED**;

C.   Regarding Double K's and JKL's status as a single enterprise, Defendants' Motion is **DENIED**;

28

D.    Regarding Kynard's status as the alter ego of Double K or JKL, Defendants' Motion is **GRANTED**.

By separate order, the court will dismiss all claims against Johnny W. Kynard, III.

Additionally, the court will set a final pretrial conference by separate order.

**DONE** and **ORDERED** this the 10th day of May, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

29